Max Fogel v. Commissioner. Max Fogel and Helen Fogel v. Commissioner.
Fogel v. Commissioner
Docket Nos. 44131, 44144.
United States Tax Court
T.C. Memo 1955-186; 1955 Tax Ct. Memo LEXIS 158; 14 T.C.M. (CCH) 728; T.C.M. (RIA) 55186; June 30, 1955
*158 1. During the taxable years the petitioner was a partner in several partnerships which engaged in the placing of wagers on horse races and in one partnership which engaged in the acceptance of wagers on horse races. Held, on the facts, (a) the petitioner has not established that the betting losses sustained by one of the betting partnerships, Rozman, were correctly set forth in the partnership records; the amount of losses sustained by Rozman determined; (b) the petitioner has not established that Maylan, another betting partnership, sustained any of the net betting losses set forth in the partnership records; (c) a third betting partnership, K.F. and P., sustained betting losses in 1948 in the amount set forth in the partnership records; (d) the petitioner has not established that K.F. and P. sustained betting losses in 1949 or 1950 in the amounts set forth in the partnership records; the amount of betting losses sustained by K.F. and P. in 1949 and 1950 determined; (e) the bookmaking partnership, Fogel Bros. Service, had "hits," or amounts payable to winning bettors, in the amounts set forth in the partnership books for the years 1946 to 1949, inclusive; (f) the petitioner has *159 not established that Fogel Bros. Service realized bookmaking income in 1950 in an amount less than 14 per cent of the wagers it accepted. 2. Held, the respondent's determination of fraud penalties under section 293(b) of the 1939 Code is disapproved. [But penalties under section 294(d) on estimated tax were approved.] John Driskill, Esq., 2089 Sherman Avenue, Norwood, Ohio, for the petitioners. Charles R. Hembree, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies in income tax and penalties as follows: Section
Section
Year
Deficiency
293(b)
294(d)
1946
$ 301.52
$ 150.76
$ 102.96
1947
36,963.15
18,481.58
6,336.96
1948
28,613.98
14,306.99
6,200.18
1949
90,413.72
45,206.86
14,552.98
1950
74,199.56
37,099.78
13,475.57
The principal question to be decided is whether the petitioner realized income from bookmaking and wagering in each of the taxable years in excess of the amounts reported in his income tax returns. The second question to be decided is whether any part of any deficiency is due to fraud with intent to evade tax, *160 under the provisions of section 293(b) of the 1939 Code. Also in issue are the additions to tax determined by respondent under the provisions of section 294(d) for failure to file declarations of estimated tax and for substantial underestimates of estimated tax. Findings of Fact By agreement of the parties, the transcript and exhibits in the cases of Robert Fogel, Docket Number 44016, and Robert Fogel and Sylvia Fogel, Docket Number 44017, were made a part of the record in this proceeding. Max Fogel filed individual returns for 1946 and 1947, and Max and Helen Fogel filed joint returns for 1948, 1949, and 1950, with the collector for the first district of Ohio. During the taxable years, Max and Helen Fogel were husband and wife, residing in Cincinnati, Ohio. The issues in this proceeding involve only Max Fogel, who hereinafter will be referred to as the petitioner. During each of the taxable years, the petitioner was a partner in one or more of four enterprises engaged in gambling operations. Three of the partnerships, Rozman Enterprises, Maylan Enterprises, and K.F. and P. Enterprises, were handicapping enterprises engaged in the business of making bets on horse races. The *161 fourth partnership, Fogel Bros. Service, engaged in the business of accepting horse race bets which were placed with several bookmakers with whom it had profit-splitting agreements. Rozman Enterprises During the years 1947 to 1950, inclusive, the petitioner was a partner in Rozman Enterprises (hereinafter referred to as Rozman). Petitioner's brother, Robert Fogel, was the controlling partner in, and did the handicapping and betting for Rozman. The number of partners in Rozman at any one time varied between 5 and 7, and petitioner's share of the partnership's profits and losses ranged from 5 to 15 per cent. Robert Fogel placed about 90 per cent of Rozman's bets with Bobben Enterprises, Newport, Kentucky, and the balance at race tracks and poolrooms. More than one bet was made each day, the number of bets depending upon how many horses Robert Fogel believed to be logical winners. Robert Fogel was assisted in his Rozman betting operations by Simon Gertzman. Gertzman received a salary from Rozman; he also had an interest in Rozman's profits of 2 per cent from October 19, 1947 to December 31, 1949, and of 5 per cent during 1950. Robert Fogel made his racing selections at Bobben's *162 office with the help of Gertzman, who prepared and collected information for Robert on past performance of horses, track conditions, weights to be carried, odds, and names of jockeys. Gertzman kept daily records which showed the names of the horses bet on by Robert, the amounts and positions wagered, and whether the bet won or lost. At the end of each day, he checked his record with the records kept by Bobben. If the two records were in accord, he computed the net amount of Robert's win or loss for the day's activity and then destroyed his detailed record. Gertzman retained these net win or loss figures until the end of the week, when he gave them to Robert, together with certain notations concerning expenses. Also at the end of each week, Robert entered in Rozman's permanent records certain net win or net loss figures for each day of the preceding week. The permanent record kept in each year by Robert for Rozman consisted of a bound, hard-covered record book, containing 6-column pages. For each day, the petitioner entered one figure for the net win or loss from betting, and figures for expenditures for salary, racing forms, and miscellaneous. A net win figure was entered for the *163 day to indicate that the amounts Robert won on his winning wagers exceeded the amounts lost on losing wagers; a net loss for the day indicated that his losses for the day allegedly exceeded his winnings. He also entered a cumulative net win or loss total for the month, computing expenses as losses. The following is illustrative of the entries made in Rozman's permanent records: "1947
Cards &
Win
Lose
Salaries
Forms
Misc.
Total
"Sept. 1
$ 552.25
W $ 552.25
"Sept. 2
608.10
W 1,160.35
"Sept. 3
840.00
W 2,000.35
"Sept. 4
1,127.00
W 3,127.35
"Sept. 5
$3,231.00
L 103.65
"Sept. 6
1,193.00
(50.00
18.90
L 1,465.55
(100.00"
Other than the daily net win and loss figures recorded by Robert in his permanent record, no details of the Rozman betting operations, such as the names of horses, total amounts of bets placed, total winnings, and total losses, were retained. Once each month, Robert mailed or took to Ruben E. Cohen, a certified public accountant, a sheet containing the same figures as Rozman's permanent record book, except for the omission of the cumulative total column. *164 Cohen prepared Rozman's partnership returns from summaries which he compiled from the monthly sheets. The figures on Rozman's returns agreed with those in the permanent record book, monthly sheets, and summaries. Rozman's returns reported "Gross receipts from business or profession," business expenses, and net income in the following amounts: Gross
Business
Net
Year
Receipts
Expenses
Income
1947
$28,767.50
$ 871.00
$27,896.50
1948
27,290.40
1,038.45
26,251.95
1949
5,585.45 [1]
9,747.85
(4,162.40) [1]
1950
30,508.75
869.50
29,639.25
The amounts reported for "Gross receipts from business or profession" represented the excess for the year of the daily net wins recorded by Robert over the daily net losses, and were computed by Cohen as follows: 1947
1948
1949
1950
Total Daily net wins
$141,893.20
$188,664.90
$151,589.75
$146,074.20
Total Daily net losses
113,125.70
161,374.50
146,004.30
115,565.45
Net Wins for Year
(Gross receipts)
$ 28,767.50
$ 27,290.40
$ 5,585.45
$ 30,508.75
*165 Distributions of partnership profits were made to petitioner and the other Rozman partners whenever Robert believed he had more cash than was necessary for his betting operations. No records were kept of these distributions. The only records relating to Rozman's operations that were submitted to respondent's agents in the course of their examination were the monthly statements which had been given to Cohen by Robert, and the summaries prepared from them by Cohen. The respondent disallowed, for lack of substantiation, all the daily net losses shown on the monthly statements, and increased Rozman's net income for each of the taxable years in the amount, of the disallowed daily net losses, namely, $113,125.70 in 1947; $161,374.50 in 1948; $146,004.30 in 1949; and $115,565.45 in 1950. As a result of this redetermination of Rozman net income, respondent increased petitioner's distributive share of Rozman net income as follows: Increase
Determined
Determined
Reported by
by
by
Year
Petitioner
Respondent
Respondent
1947
$ 915.61
$ 9,011.32
$ 8,095.71
1948
915.10
8,683.83
7,768.73
1949
(1,698.26)
7,536.88
9,235.14
1950
1,914.92
13,471.47
11,556.55
*166 Rozman sustained betting losses in the taxable years 1947 to 1950, inclusive, as follows: Betting
Year
Losses Sustained
1947
$ 79,000
1948
100,000
1949
89,000
1950
78,000
Maylan Enterprises During 1947, petitioner was the controlling partner in and did the betting for Maylan Enterprises (hereinafter referred to as Maylan), another betting venture. Maylan was in existence from June 23 to November 20, 1947, and consisted of 6 partners from June 23 to October 31, and 5 from November 1 to November 29. Petitioner's interest in Maylan's profits during these two periods was 45 and 48.4 per cent, respectively. At the end of each month, Ruben Cohen received from one of the Maylan partners a single page which listed either a "win" or a "lose" figure for each business day of the month, and figures showing payments for salaries, racing cards and forms, and miscellaneous expenses. The following are illustrative of the entries shown on the monthly sheets received by Cohen: "1947
C & F
Win
Lose
Salaries
Papers
Misc.
"Sept. 1
$ 927.25
"Sept. 2
658.10
"Sept. 3
$ 735.00
"Sept. 4
3,165.00
"Sept. 5
7,870.00
"Sept. 6
1,937.00
$100.00
12.00
60.00"
*167 Cohen compiled summaries of these monthly sheets and prepared Maylan's return from the monthly sheets and summaries. Copies of the monthly sheets submitted to Cohen were retained by Maylan. These retained copies contained an additional "Total" column in which the cumulative win or loss for the month was computed by subtracting the daily losses and expenses from the daily wins. The person or persons who prepared the monthly statements for Cohen did not testify in these proceedings. Maylan reported net income in 1947 of $13,306,50, which was determined by Cohen as follows: Total Win
$105,561.40
Total Loss
91,859.90
$ 13,701.50
Less expenses for telephone,
supplies & accountant's
fees
395.00
Net income
$ 13,306.50
The total "win" and "loss" figures are, respectively, the sums of the daily "win" and daily "lose" entries on the monthly statements. The only records relating to Maylan's operations that were submitted to respondent's agents consisted of Cohen's copies of the monthly statements, and his summaries thereof. The respondent disallowed, for lack of substantiation, the total loss shown for losing days on the monthly statements, namely, $91,859.90, *168 and increased Maylan's net income in that amount, from $13,306.50 to $105,166.40. As a result of this adjustment, respondent increased petitioner's distributive share of Maylan income in the amount of $41,364.54, from the $6,800.94 reported in his return, to $48,165.48. K.F. and P. Enterprises During the years 1948 to 1950, inclusive, petitioner had a controlling interest in a third betting venture, K.F. and P. Enterprises (hereinafter referred to as K.F. and P.). The number of partners in K.F. and P. during these years ranged from 4 to 9. Petitioner was in charge of the partnership's handicapping and betting, and his interest in the partnership profits varied from 52.5 to 75 per cent. The partnership also purchased and sold race horses and entered horses in races during the taxable years. During 1948, petitioner was assisted in his betting for K.F. and P. by Simon Klayman. Klayman had a 20 per cent interest in the partnership profits during 1948 and January 1949, and also received a salary of $4,800 during 1948. Bets for K.F. and P. were placed with Bobben Enterprises, Newport, Kentucky, and at race tracks. The percentage of bets placed with each varied from day to day, and *169 the number of bets made each day ranged from 3 to 20. Each day, Klayman prepared a daily sheet which contained a detailed record of the bets placed for K.F. and P. This daily sheet listed the name of each horse on which a bet was placed; the amount wagered; the finish position selected; whether the horse won; and the amount of the win in the case of winning wagers. When Klayman placed bets at a track for K.F. and P., he marked his bets on the racing program. At the end of the day's betting activities, or during the following morning, Klayman totaled the "play," or wagers placed, and "hits," or amounts won on winning bets, to determine the net results of the day's betting. In computing "hits," Klayman included the expenses incurred during the day. If the "play" recorded by Klayman exceeded the "hits," the difference computed by Klayman would be the net win for the day; if the "hits" total was larger, the excess over total "play" would be the net loss for the day. Klayman recorded the net win or loss for the day in the permanent records kept by him for K.F. and P., and then destroyed the detailed betting records. The partnership records for K.F. and P. for January to September 1948, *170 consisted of a bound 8-column record book in which Klayman recorded for each day's activity the date, the net win or lose figure computed by him, the partners' salary, and a running win or loss total for the month to date. The following is illustrative of the record made by Klayman: "JANUARY 1948
Partners
Win
Lose
Salary
Total
Jan. 1
$459.00
W $ 459.00
Jan. 2
327.00
W 786.00
Jan. 3
411.00
$300.00
W 1,197.00
Jan. 5
618.00
W 1,815.00
Jan. 6
$272.00
W 1,543.00
Jan. 7
506.00
W 2,049.00
Jan. 8
219.00
W 2,268.00
Jan. 9
264.00
W 2,532.00
Jan. 10
403.00
300.00
W 2,129.00"
Beginning in August 1948, the K.F. and P. permanent records consisted of a series of individual printed daily sheets. On each sheet, Klayman entered the date; a "Balance Brought Forward," which apparently represented a running account of the partners' investment; the net win or loss for the day; the expenditures for racing records, salaries, and other expenses; and a closing balance for the day. The partnership return for K.F. and P. for 1948 was prepared by Jack Kuresman, an accountant, on the basis of the information *171 contained in the bound book and daily sheets compiled by Klayman. K.F. and P. reported "Gross receipts from business or profession," expenses, and net income in the amounts of $67,568, $425, and $67,143, respectively. Kuresman determined petitioner's "gross receipts" by subtracting the total daily net loss figures listed in records, $76,579, from the total of the daily net win figures, $144,147. The records relating to K.F. and P.'s activities for 1948 that were submitted to respondent's agents consisted of the bound record and daily summary sheets which had been given to Kuresman; a journal into which Kuresman had copied summaries of bound book and daily summary sheets; and additional summaries prepared by Kuresman. The respondent disallowed, for lack of substantiation, the total amount of daily net losses shown for losing days in the partnership records, namely, $76,579. The respondent also allowed K.F. and P. additional deductions in the amount of $5,588, and increased the partnership's net income in the net amount of $70,991. As a result of this adjustment, the respondent increased petitioner's distributive share of K.F. and P. income in the amount of $39,168.80, from the amount *172 of $38,056.05 reported by petitioner, to $77,224.85. The K.F. and P. books and records correctly set forth the betting losses and expenses incurred by the partnership during 1948. Starting in about February 1949, and continuing throughout 1950, the permanent records of K.F. and P. were kept by Morris Nassan. Nassan had a 5 per cent interest in K.F. and P.'s profits from February to October 1949, inclusive. The records kept by Nassan consisted of the same type of summary sheets as were kept by Klayman beginning in August 1948. Each day Nassan would be given a detailed record of K.F. and P.'s betting activities, and he would copy the net win or loss figure shown on such record to his summary sheet. The detailed betting record was furnished to him by one of the other partners in K.F. and P., usually one Kahn. When Nassan received the record, the net win or loss had already been computed. Unlike Simon Klayman in 1948, Nassan did not prepare the detailed betting record from which he copied the net win or loss figures. Also, he did not participate in the betting or have any personal knowledge as to the accuracy or reliability of the entries on the detailed betting records. Nassan destroyed *173 the detailed records after he had transcribed the net win or loss figure to his summary sheet, normally at the end of the day's betting. The person or persons who did the betting for K.F. and P. and who prepared the detailed betting records for Nassan, in 1949 and 1950, did not testify in this proceeding. Kuresman prepared the K.F. and P. returns for 1949 and 1950 from Nassan's summary sheets. For these years, the partnership reported "Gross receipts from business or profession," cost of labor, supplies and other expenses, and net income, as follows: 1949
1950
Gross Receipts
$72,121.39
$67,898.27
Less Costs and
Expenses
46,153.00
6,629.42
Net Income
$25,968.39
$61,268.85
Kuresman apparently computed the figures for "gross receipts" as follows: 1949
1950
Daily net betting wins
$281,257.00
$238,447.00
"Win at Tracks"
35,000.00
Net Profit (loss) from selling race
horses and
entering horses in races
542.39
(5,945.73)
$316,799.39
$232,501.27
Less: Daily Net Betting Losses
244,678.00
164,603.00
Gross Receipts
$ 72,121.39
$ 67,898.27
Before he filed K.F. and P.'s return for 1949, but after he had computed the *174 yearly totals in his ledger and journal summaries for the various items of income and expense, Kuresman called the partnership and inquired "if there was anything to be added to this that I hadn't been given." At that time his records indicated that the partnership had sustained a net loss for the year. Several days later, Kuresman was informed on the telephone that there were two "operations" at race tracks which previously had been omitted from the information furnished him, namely, that the partnership won $10,000 at Atlantic City during August and September 1949, and $25,000 at Miami Beach, Florida. Kuresman included this $35,000 in his computation of "gross receipts" for 1949 as "win at tracks." The respondent disallowed, for lack of substantiation, the total amount of daily net losses shown on the daily summary sheets for losing days in 1949 and 1950, namely, $244,678 and $164,603, respectively. The respondent allowed K.F. and P. additional deductions for these two years in the net amounts of $813 and $3,466, respectively, thereby increasing K.F. and P. net income in the net amounts of $243,865 for 1949 and $161,137 for 1950. As a result of these adjustments, respondent increased *175 petitioner's distributive share of K.F. and P. income as follows: Correct
Increase
Reported by
Total Per
Determined
Petitioner
Respondent
by Respondent
1949
$10,797.86
$156,182.70
$145,384.84
1950
36,548.62
136,925.63
100,377.01
K.F. and P. sustained betting losses during 1949 and 1950, in addition to the losses allowed by respondent, in the following amounts: Betting
Year
Losses Sustained
1949
$140,000
1950
100,000
Fogel Bros. Service Petitioner was a partner in a bookmaking enterprise, Fogel Bros. Service (hereinafter referred to as Fogel Bros.), during the taxable years 1946 to 1950. He did not take an active part in the conduct of the partnership's business or the keeping of its books and records. In 1946, petitioner had an equal one-third interest in Fogel Bros. with his brothers, William and Robert. In the years 1947 to 1950, inclusive, he had a one-half interest in the partnership with Robert. During the taxable years, William acted as manager of the enterprise under Robert's supervision. Fogel Bros. operated from 2 or 3 "clearing houses" in Newport, Kentucky, in conjunction with a number of bookmakers *176 located in Cincinnati, Ohio. Fogel Bros. had arranged for the location of the bookmakers, and its understanding with them was that the net profits from wagers accepted by the bookmakers and telephoned to the "clearing houses" would be evenly divided. The number of bookmakers for whom entries appear in Fogel Bros.' records ranges between 4 to 10 monthly. Fogel Bros.' arrangement with the bookmakers was substantially as follows: A bookmaker, having accepted a wager, would telephone to one of the clearing houses, where a "sheet writer," or clerk, employed by Fogel Bros. would list the details of the wager on a sheet of paper approximately 8 by 10 inches in size containing printed horizontal lines. The details written down by the sheet writer consisted of the name of the horse, the amount wagered, the win, place, or show position selected, and the bettor's, initials. If a wager won, it was circled on the clerk's sheet. At the end of the day, each sheet writer totaled the "play" or total wagers shown on his sheet for the day, the amount of "hits," or payoffs due on winning bets, and the difference between the two figures. If the "hits" exceeded the "play," the result for the day was a *177 net loss; if the "play" was larger, the difference was a net win for the day. The sheet writers gave petitioner's brother, William, the figures for each bookmaker's "play," "hits," and net win or loss, and during the years 1946 to 1949, inclusive, these figures were entered in Fogel Bros.' permanent record, described below, by William or under his supervision. The clerk's sheets showing the wagering details were destroyed by William or the clerks after 2 or 3 weeks to avoid seizure in the event of a raid by police authorities. Robert Fogel, or Fogel Bros., employed one or more "collectors" who collected the sums due Fogel Bros. from the bookmakers or paid the bookmakers any amounts due from the partnership. Collections or payments usually were made each day or at least once each week, depending upon the individual bookmaker's "credit" with Robert Fogel. Fogel Bros. permanent record consisted of a ledger with 12-column printed pages. The daily activities of each bookmaker for a month were recorded on a single page, and the pages were arranged by the month and by the year. In addition to the totals for "play," "hits," and net win or loss, entries were made in the permanent record *178 to reflect cash collections from or payments to each bookmaker, and the weekly and monthly net amounts of such cash transactions. The following is illustrative of the monthly information entered for the bookmakers: "January 1950
Ted
Cash
Col-
Play
Hits
Win
Lose
lect
Pay
Total
"1.
143.
100.
43.
2.
198.
36.
162.
3.
112.
102.
10.
4.
123.
102.
21.
5.
109.
135.
26.
6.
246.
206.
40.
139.
25.
114.
7.
109.
171.
62.
49.
8.
169.
168.
1.
9.
117.
97.
20.
10.
81.
77.
4.
11.
146.
146.
0.
12.
218.
191.
27.
(49.)
13.
195.
123.
72.
14.
172.
116.
56.
15.
101.
83.
18.
16.
97.
55.
42.
17.
134.
135.
1.
18.
212.
269.
57.
113.
25.
88.
19.
180.
200.
20.
20.
20.
123.
110.
13.
21.
121.
81.
40.
22.
103.
116.
13.
23.
137.
97.
40.
24.
221.
187.
34.
100.
25.
55.
257.
49.
208."
The entries for cash collected from and paid to the bookmakers do not correspond to their net wins and losses, or to 50 per cent of such net wins and losses. In a large number of instances, the record *179 reflects a net cash payment for the week to a bookmaker whose "play" for the week exceeded "hits." The following is a summary of the 1948 monthly totals in Fogel Bros.' records for net wins or losses and cash collected or paid for a bookmaker listed as "7": Wagers
Cash
Month
Win
Lose
Collect
Pay
Jan.
$ 183.55
$258.85
Feb.
137.00
200.00
Mar.
266.25
10.00
Apr.
842.00
$ 454.50
May
657.60
492.00
June
343.70
101.00
July
29.40
344.10
Aug.
631.95
236.50
Sept.
42.00
170.50
Oct.
Nov.
Dec.
Totals
$3,104.05
$29.40
$1,353.50
$913.95
29.40
913.95
913.95
Net Win-
nings and
Cash Col-
lected
$3,074.65
$ 439.55
The Fogel Bros. permanent record was maintained by William Fogel or under his supervision in 1946, 1947, 1948, and 1949, and after that time by two unidentified sheetwriters. At the end of each year, the record was given to Ruben Cohen, who prepared Fogel Bros.' partnership returns for the taxable years. Fogel Bros. reported the following gross profit and net income or loss, for the taxable years: 1946
1947
1948
1949
1950
Gross Profit
$34,968.20
$18,895.20
$14,127.75
$13,801.30
$16,229.68
Net Income (Loss)
12,655.50
(3,816.95)
(2,482.95)
(2,448.15)
(158.05)
*180 Cohen apparently computed Fogel Bros. gross profit on the basis of the entries in the ledger for cash collections and payments, and not on the basis of the entries for total "play," "hits," and net wins and losses. The figures for the cash collections and payments, and of other items of income reflected on the partnership records, are as follows: 1946
1947
1948
1949
1950
Cash collected
$33,669.90
$22,358.05
$17,143.15
$16,357.85
$18,004.50
Cash paid out
1,950.30
1,849.70
983.70
90.00
Net cash collected
$31,719.60
$20,508.35
$16,159.45
$16,267.85
$18,004.50
Losing Lay-off Bets
3,322.60
1,613.15
2,031.70
2,466.55
1,886.40
$28,397.00
$18,895.20
$14,127.75
$13,801.30
$16,118.10
"Personal" wagers won
6,571.20
Other
111.58
Gross Profit
$34,968.20
$18,895.20
$14,127.75
$13,801.30
$16,229.68
The only record relating to Fogel Bros. that was submitted to respondent's agents was the ledger book. The respondent redetermined Fogel Bros. net income on the basis of the figures for total "play" recorded in the partnership records and not by using the entries for cash collections and payments. The respondent *181 determined that the figures for "hits" in the ledger could not be substantiated, and that an allowance for "hits" equal to 86 per cent of total "play" was reasonable. In computing net income, respondent accepted the figures shown in Fogel Bros.' records for winnings on "personal" wagers, losses on lay-off bets, and expenses, and redetermined partnership net income as follows: 1946
1947
1948
1949
1950
Total Play
$519,239.25
$567,632.99
$385,148.70
$368,928.45
$401,722.75
Less hits
446,545.75
488,164.37
331,227.88
317,278.47
345,481.57
Profit on Wagers
72,693.50
79,468.62
53,920.82
51,649.98
56,241.18
Fogel Bros. Share
36,346.75
39,734.31
26,960.41
25,824.99
28,120.59
(50%)
Personal Wagers
6,571.20
Won
Lay-off Wagers
(3,322.60)
(1,613.15)
(2,031.70)
(2,466.55)
(1,886.40)
Lost
Gross Profit
39,595.35
38,121.16
24,928.71
23,358.44
26,234.19
Expenses
22,312.70
22,712.15
16,610.70
16,249.44
16,387.73
Net Income
$ 17,282.65
$ 15,409.01
$ 8,318.01
$ 7,109.00
$ 9,846.46
The respondent's determination of Fogel Bros.' net income resulted in the following increases in partnership net income and in petitioner's *182 distributive share of partnership net income: Partnership Income (Loss)
Petitioner's Distributive Share
Increased
Total per
Increased
Total per
by
by
Year
Reported
Respondent
Respondent
Reported
Respondent
Respondent
1946
$12,655.50
$ 4,627.15
$17,282.65
$4,218.50
$1,542.38
$5,760.88
1947
(3,816.95)
19,225.96
15,409.01
(1,908.47)
9,612.97
7,704.50
1948
(2,482.95)
10,800.96
8,318.01
1,241.47
5,400.48
4,159.01
1949
(2,448.15)
9,557.15
7,109.00
(1,224.08)
4,778.58
3,554.50
1950
(158.05)
10,004.51
9,846.46
(150.00)
5,073.23
4,923.23
The "play" and "hits" recorded in Fogel Bros. ledger for 1946, 1947, 1948, and 1949 correctly reflect the partnership's bookmaking activities for those years. In 1950, Fogel Bros. did not sustain "hits" in excess of 86 per cent of the "play" recorded in its ledger. Petitioner and his brother, Robert, operated Fogel Bros. during the years 1943 and 1944. Their returns for these years were examined by respondent's agents, and they were informed by a letter dated December 16, 1946, from the Internal Revenue Agent in charge, Cincinnati Division, that their returns *183 for 1943 and 1944 were accepted as filed. No part of any deficiency is due to fraud with intent to evade tax. Opinion The principal question to be decided is whether the respondent correctly determined that petitioner's distributive shares of income from wagering and bookmaking partnerships in each of the taxable years were greater than the amounts reported in his returns. Also in issue are penalties and additions to tax determined by the respondent under sections 293(b) and 294(d) of the Code. Under the principal issue, the narrow question is whether the petitioner has substantiated the betting and bookmaking losses which were claimed in the computation of the partnerships' reported income. The other items which entered into the partnerships' reported income such as the totals for the partnerships' winning bets (in the case of Rozman, Maylan, and K.F. and P.), wagers accepted (in the case of Fogel Bros.), and expenses, have not been questioned by the respondent, and the petitioner has not contested several minor adjustments determined by respondent in connection with the ownership of certain race horses by K.F. and P. The income reported by each partnership was computed *184 by Cohen or Kuresman, who were accountants, on the basis of certain summary records furnished by the partners. Cohen and Kuresman had no personal knowledge of the accuracy or reliability of the figures contained in the records given to them. In the case of the wagering enterprises, Rozman, Maylan, and K. F. and P., these records contained only a single net win or lose figure which purported to summarize the net results of each partnership's entire betting operations for the day, without giving any of the underlying details, such as the number of bets made, horses bet on, amounts wagered, and amounts received on winning wagers. The daily net loss figures recorded in these records purportedly represent the amount by which betting losses for the day exceeded betting winnings. All of the losses represented by the net loss figures in the records of the three betting partnerships were disallowed by respondent on the ground that petitioner had not established that the losses actually were sustained. In the case of Fogel Bros., the bookmaking partnership, the records furnished to Cohen contained a daily figure for total bets accepted, or "play" and a figure for total payoffs, or "hits," for *185 each of the bookmakers with whom the partnership had agreed to divide profits. The records did not contain a list of the bets on which "hits" allegedly were sustained, the amounts of the individual "hits," or the identity of the winning bettors. The Fogel Bros. record also contains entries for cash collected from or paid to each bookmaker. These entries purportedly represent the division of profits and losses between Fogel Bros. and the bookmakers, and were the basis upon which the partnership returns were prepared. Respondent redetermined Fogel Bros. income on the basis of the "hit" and "play" figures in its record, allowing as "hits" an amount equal to 86 per cent of the "play" and disallowing, as unsubstantiated, the "hits" entered in the record in excess of that amount. The petitioner contends that the respondent cannot accept as accurate that portion of the partnership records which reflect winning wagers and wagers accepted, while at the same time disallowing the losses and "hits" recorded in the records. This contention was rejected in , where it was pointed out that the net gain figures recorded in a bet taker's records were, in a sense, *186 admissions against interest and thus more reliable than the net loss figures. The reliability of the net loss and "hit" figures in the summary record as proof of losses and "hits" actually sustained depends upon whether the detailed betting sheets prepared each day correctly set forth the details of each individual loss and the computation of any net loss; and also, upon whether the net loss and "hit" figures shown on the detailed daily sheets were accurately transcribed to the summary records. The petitioner has the burden of proving that the losses claimed were in fact sustained. The issue is a factual one and is to be decided on the basis of the evidence adduced. The detailed daily betting sheets have been destroyed, and the petitioner relies on oral testimony to establish the reliability of the net loss and "hit" entries in the retained summary records. Each of the partnerships involves a somewhat different factual situation and will be discussed separately. Rosman Petitioner relies on the testimony of Robert Fogel and Simon Gertzman in the Robert Fogel cases, Docket Numbers 44016, 44017, to establish that the net loss figures in Rozman's *187 records accurately reflect the net result of the betting activities for the days on which such net loss figures were entered. We do not accept this testimony as establishing that the daily net loss figures entered by Robert Fogel substantiate the losses claimed by Rozman. In the first place, it is not clear from their testimony whether the entries made by Robert were taken from the notations given to him by Gertzman, or from an entirely different set of memoranda which Robert compiled independently. Gertzman testified that he destroyed his detailed betting record at the end of each day, and that he gave Robert, at the end of each week, only daily net win or loss figures. Robert, on the other hand, admitted on cross-examination that he kept detailed betting records which were not destroyed until the end of the week. Moreover, Robert Fogel's testimony that he accurately copied the net win and loss figures, whether in reference to the figures obtained from Gertzman or to the figures contained in the detailed records maintained by himself, was at best self-serving, and in our opinion, not worthy of any substantial weight. We conclude that petitioner has not proved that the retained Rozman *188 summary records accurately reflect the betting losses sustained by Rozman, or that Rozman actually sustained losses in the amounts claimed in the computation of its reported net income. Respondent's determination implicitly allowed Rozman all betting losses sustained on days in which net wins were recorded, and on other days, losses equal to winnings. We are satisfied from the entire record, however, that Rozman did experience days on which losses exceeded winnings, and we hold that Rozman is entitled to losses, in addition to those allowed by respondent, in the amounts set forth in our Findings of Fact. In determining the amount of allowable losses, we have considered the entire record and borne heavily against petitioner, whose failure to maintain adequate records resulted in this controversy. ; see also Maylan The loss figure used by Cohen in computing Maylan's net income was the total of the daily net loss figures given to him by a Maylan partner at the end of each month. The record does not contain any details of Maylan's betting activities or indicate who prepared the figures submitted *189 to Cohen or what the figures represent. We hold that petitioner has failed to prove that Maylan sustained any of the net losses claimed. The respondent's determination with respect to Maylan is approved. K. F. and P. During 1948, Simon Klayman maintained both the detailed daily betting sheets and the summary records of net win and loss for K. F. and P. Klayman also was personally familiar with the details of K. F. and P.'s betting operations. He testified in this proceeding concerning the manner in which he filled out the detailed betting sheets as bets were placed for K. F. and P., and how he copied the net win or loss figure computed by him into the retained summary records. We think his testimony was candid and credible, and should be accepted. We hold that K. F. and P.'s summary records correctly reflect the betting losses and expenses sustained in its 1948 operations, and that respondent erred in disallowing the daily net losses recorded for 1948. The daily net loss figures for 1949 and 1950 were copied to K. F. and P.'s retained summary records by Morris Nassan. Nassan, however, did not maintain the detailed betting sheets from which the net win and loss figures were copied. *190 The latter were given to him by one of the K. F. and P. partners, usually Kahn. While Nassan may have accurately transcribed the net figures into his summary records, petitioner has introduced no evidence indicating that the figures given by Kahn to Nassan represented losses actually sustained. Kahn did not testify at this proceeding; neither did the person or persons who prepared the detailed sheets and computed the net loss figures for Nassan. On the other hand, the unreliability of the figures given to Nassan, which in turn were given to the accountant, Kuresman, is indicated by the partners' advice to Kuresman to add $35,000 to income for 1949. This action apparently came as an afterthought, when it was discovered that Nassan's figures indicated that K. F. and P. had sustained an overall loss for the year. In the absence of evidence establishing the accuracy of the figures given to Nassan, we hold that petitioner has failed to prove that K. F. and P. actually sustained losses in the amounts recorded in its summary records by Nassan in 1949 and 1950. We do think, however, on the basis of the entire record, that K. F. and P. did experience some net loss days during these two years, *191 and that on those days the partnership sustained net losses in the amounts set forth in the Findings of Fact. Fogel Bros. Service The gross profit reported by Fogel Bros. for each of the taxable years was computed by Ruben Cohen on the basis of the ledger entries for cash collected from and paid to the bookmakers with whom the partnership did business. Cohen did not attempt to compute the partnership's bookmaking income by subtracting the "hits" from the total "play." Respondent recomputed the partnership's income on the basis of the figures for "play" shown in the record, allowing "hits" in each year equal to 86 per cent of the play, and disallowing all "hits" for each year in excess of 86 per cent. The cash transaction figures, purportedly representing collections from or payments to each of the individual bookmakers with whom the partnership had agreed to divide profits, cannot be reconciled with the entries recorded in Fogel Bros. record for the bookmakers' wins and losses. In many instances, payments in excess of collections are recorded for weeks in which the bookmakers realized winnings in excess of losses. For one bookie, identified only as "7", the record book shows *192 "play" in excess of "hits" for the year 1948 in the amount of $3,074.65, whereas the recorded net cash collections from him equalled only $439.55 for the year. These discrepancies have not been satisfactorily explained by petitioner, and we conclude that the petitioner has not established that the cash transaction figures in Fogel Bros. records correctly reflect the partnership income. Petitioner also contends that the respondent's allowance of "hits" equal to only 86 per cent of "play," instead of the full amount of "hits" recorded in the ledger, is arbitrary and unreasonable and cannot be sustained. Petitioner's position is that the "play" and "hit" figures were correctly and accurately recorded into the ledger by or under the supervision of William Fogel, the partnership's manager, from the sheetwriters detailed daily sheets; and that if Fogel Bros. income is to be determined on the basis of the "play" and "hits" instead of the cash transaction figures, then all "hits" recorded in the ledger must be taken into account. With the exceptions noted below, we think the petitioner should be sustained. The acceptance of the ledger entries as proof of Fogel Bros. losses depends upon the *193 credibility of William Fogel's testimony.we have had the opportunity to observe his demeanor, and we feel that his sworn testimony that the "play" and "hit" figures were correctly transcribed by him or under his supervision should be accepted. We hold that the "hit" figures entered in the ledger for the years 1946 through 1949, inclusive, correctly reflect the results of Fogel Bros. bookmaking payoffs, and that respondent erred in disallowing "hits" in excess of 86 per cent of "play" in recomputing the partnership's income. The entries in Fogel Bros. ledger for 1950 were not made by or under William Fogel's supervision. Robert Fogel testified that two of the sheetwriters performed this work during 1950, but he did not recall their identities; and the person or persons who made the ledger entries in 1950 did not testify in this proceeding. On this state of the record, the petitioner has not established the accuracy or reliability of the "hits" entered in the ledger for 1950; nor has he established that respondent's allowance of "hits" equal to 86 per cent of "play" was erroneous. We hold that respondent did not err in disallowing all "hits" in excess of 86 per cent of "play" for 1950. *194 Fraud Penalties Respondent has determined 50 per cent penalties for each of the taxable years, under the provisions of section 293(b). The respondent has the burden of proving that part of any deficiency is due to fraud with intent to evade tax, and the evidence necessary to establish fraud must be clear and convincing. , certiorari denied, ; . The respondent points to the conceded intentional destruction of the detailed betting records of the various partnerships as evidence of fraudulent intent. However, we think the destruction of the records in this case is equally consonant with the desire of petitioner, his partners, and their employees to prevent the seizure of evidence of their illegal wagering activities by police authorities. Moreover, the record indicates that petitioner's records for years prior to those in issue had been examined by respondent's agents; that no deficiencies were found; that those records were no more adequate or detailed than the records kept for the taxable years; and that Robert Fogel adopted certain changes *195 in record keeping suggested by the respondent's agents. Under these circumstances, we cannot accept the destruction of the records as convincing proof of a fraudulent intent to evade tax. Respondent also relies on petitioner's failure to heed the advice of Cohen, his accountant, to institute changes in the recordkeeping. However, the evidence indicates that Cohen advised petitioner and his brother, Robert, only "that their present records were not as concise as the Government would like to have them to be." Petitioner's failure to heed this advice is hardly evidence of a fraudulent intent. We hold that respondent has failed to prove that part of any deficiency for any of the taxable years was due to fraud. Additions to Tax under Section 294(d) The petitioner has introduced no evidence indicating any error in the respondent's determination of additions to tax under sections 294(d)(1)(A) and 294(d)(2), and respondent's determination is approved. Decisions will be entered under Rule 50. Footnotes
1. Rozman filed 3 returns for 1949, covering the periods January 1 to June 11, June 13 to October 8, and October 10 to December 31. The figures set forth above represent the totals reported for the three periods.↩