KENNETH A. FORMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Forman v. Commissioner
Docket No. 32324-85.
United States Tax Court
T.C. Memo 1988-64; 1988 Tax Ct. Memo LEXIS 90; 55 T.C.M. (CCH) 139; T.C.M. (RIA) 88064; February 23, 1988. Edward Wishnow, for the petitioner. Chauncey W. Tuttle, Jr., for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice dated May 24, 1985, determined deficiencies in income tax and additions *92 to tax as follows: Year
Tax
Sec. 6653(b) [1]
Sec. 6661
1982
$ 28,240.00
* $ 14,120.00
$ 2,824.00
1983
11,622.00
* 5,811.00
1,162.20
The issues for our consideration involve petitioner's gambling activities during the years in question. The questions presented are: (1) Whether petitioner failed to include in gross income amounts attributable to gambling winnings; (2) whether these omissions were due to fraud; (3) whether petitioner is entitled to more gambling losses than those allowed by respondent; and (4) whether petitioner is liable for the section 6661 addition for substantial understatement of income tax liability. FINDINGS OF FACT Petitioner, Kenneth A. Forman, is a cash method, calendar year taxpayer, who resided in Southfield, Michigan, at the time the petition was filed in this case. The stipulated facts and exhibits are incorporated herein by this reference. Petitioner engaged *93 in considerable gaming activities during the years at issue, including many sporting events, the state lottery, and the horse racing that is in issue in this case. He was not employed for more than a week during the years at issue. He spent approximately 170 days at horse tracks in 1982 and 120 days in 1983. The activity that is the subject of this case is parimutuel wagering on horse races. Such wagering is a cash business, both for the purchases of tickets and the award for winning tickets. An individual can place bets in a number of ways. He may bet on a particular horse to win, place (finish first or second), or show (finish third or better) in a particular race. In addition, there are a number of "gimmick" wagers offered at racetracks. These include a daily double: picking the first horse in two consecutive races, and a trifecta: picking the first, second and third horses to finish in a race. Also, one may make different combinations of bets in a trifecta by "boxing" [2] and "wheeling." [3] Petitioner was especially fond of the gimmick wagers. The payoff on such wagers is generally higher because the odds of picking such horses to finish in order are much greater. *94 There are usually nine or ten races on a race "card," with 15 or 20 minutes between each race. A bettor could wager in advance on any subsequent race. Petitioner typically came to the track 15 to 30 minutes before race time and could place bets starting from 30 to 45 minutes before the first race. At any given track, there are usually several hundred betting windows, spread among three or four tiers of seats or standing areas to view the races. It takes from 2 to 5 minutes to move between tiers. In addition to the entrance fee to the track, usually there was also an extra charge to sit in the more desirable tiers. An individual's wagers are represented by tickets. Each ticket holds up to four lines of betting, and each line may hold 70 bets. [4] Information on the ticket includes the amount bet, the type of bet, the racetrack name, and the ticket window where the bet was placed. *95 Winning tickets must be turned in to the track in exchange for the amount won. Because multiple bets may be placed on a ticket, any winning ticket may also have some losing bets on it. Racetracks are required to report to the Internal Revenue Service, on Form W-2G, all winning tickets cashed in excess of $ 600, and are required to withhold taxes on winnings in excess of $ 1,000. Petitioner won approximately $ 100 per day on winning tickets cashed of less than $ 600. [5]
On his 1982 return, petitioner claimed gambling winnings of $ 122,055 and gambling losses of $ 105,000. On his 1983 return, petitioner claimed gambling winnings of $ 65,786 and gambling losses of $ 65,786. The gambling winnings included only tickets *96 cashed in excess of $ 600, and approximately $ 8,000 in winnings from the state lottery. [6] Petitioner did not include on his returns winnings that he received under the amount of $ 600, nor did he keep any records of these winnings. He believed such winnings were offset by losses included on winning tickets. Because he had to turn in such tickets, petitioner had no other record of the losses. Petitioner did not keep a daily record of how much he bet, nor of how much he won or lost. Petitioner bet largely based on intuition; there was no pattern to his betting. He bet at different windows, even for the same race, and at different times of day. Subsequent to the filing of his 1982 income tax return, petitioner filed a suit for refund, alleging that he was entitled to a refund of approximately $ 17,000, in the United States District Court for the Eastern District of Michigan, Southern Division. That case was filed April 20, 1984, and was dismissed subsequent to the filing *97 of this case pursuant to section 7422(e). Pursuant to the earlier district court case, petitioner turned over to the Department of Justice 5,310 parimutuel betting tickets for taxable year 1982. These tickets represented 11,547 separate betting lines on tickets and represented 41,657 separate bets. These tickets represented the expenditure of approximately $ 105,000 and were the only substantiation for petitioner's claimed losses. These were later turned over to an agent of respondent. Similarly, petitioner turned over to respondent's agent 3,388 parimutuel betting tickets for 1983. These tickets represented 6,840 separate betting lines and 24,138 separate bets. These tickets represented the expenditure of approximately $ 57,000, and were also the sole substantiation for petitioner's claimed gambling losses. Petitioner had no bank accounts during 1983 or 1983, nor did he keep any funds in banks or other financial institutions, or borrow from any such financial institutions. He earned income from two jobs totaling $ 49. The only other sources of funds petitioner had during 1982 and 1983 were from gambling winnings and loans from his father, Jack Forman, and his brothers, Paul *98 Forman and Richard Forman. He did not borrow any funds from his brother Bruce Forman, and none of the funds he borrowed from his mother Blanche Forman were used for gambling. During 1982 and 1983 petitioner borrowed in the neighborhood of $ 5,000 from his father, Jack Forman. These borrowings were in increments smaller than $ 5,000. The amounts ranged from a few hundred to a thousand dollars on each occasion. Petitioner kept no records of the borrowings; some were paid back and some were not. Total borrowings from his father did not exceed $ 7,500. In 1982 and 1983 petitioner borrowed approximately $ 10,000 each from his brothers Dr. Paul Forman and Dr. Richard Forman. These borrowings were in $ 500 to $ 1,000 increments with a constant cycle of borrowing and repaying. In 1982 he borrowed approximately $ 10,000 from each brother but at the end of 1982 he had repaid amounts so as to reduce the balance he owed to approximately $ 2,000. Because of petitioner's contentions regarding burden of going forward, it is necessary to recount the actions of respondent's agents in issuing the deficiency notice. Respondent performed a computer analysis of all the tickets handed over *99 by petitioner. This analysis consisted of a breakdown by date, race number, window, and the type and amount of each bet. From the tickets presented and the W-2G forms, respondent was able to perform a daily cash flow analysis of petitioner's asserted gambling activity. A running total was computed of net gambling winnings (winnings less Federal and state taxes) against gambling losses. On June 7, 1982, this amount was a negative $ 46,821. For 1982 this amount exceeded both petitioner's admitted unreported winnings plus the maximum amount of loans from his family members. In addition, respondent's agent, accompanied by a Department of Justice attorney, went to one of the racetracks frequented by petitioner. They made one bet approximately 15 or 20 minutes before post time, then got in line to make another 10 minutes later. Because of long lines they never succeeded in making another. They went to the track a second time but did not place any bets. They observed that lines got longer closer to post time. There were instances when no one was in line at a particular window. In administrative proceedings petitioner admitted to $ 100 a day in unreported winnings. In addition, *100 respondent disallowed any losses from any race where tickets where purchased at more than three windows or more than nine tickets were purchased for a race. OPINION The issues for our consideration involve petitioner's gambling activities during 1982 and 1983. As a preliminary matter, petitioner contends that the burden of going forward has shifted to respondent because there was no foundation for the determination of a deficiency. We disagree. The burden of proving respondent's determination incorrect is on petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). This burden of going forward shifts to respondent, however, if the determination is arbitrary or without foundation. Helvering v. Taylor,293 U.S. 507 (1935); Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979); Pizzarello v. United States,408 F.2d 579 (2d. Cir. 1969); Jackson v. Commissioner,73 T.C. 394 (1979). By contending that the notices are arbitrary, petitioner is essentially asking us to look behind the notice *101 of deficiency to examine the evidence used by respondent in making his determination. Riland v. Commissioner,79 T.C. 185, 201 (1982); Jackson v. Commissioner, supra, at 400; Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974); Weimerskirch v. Commissioner, supra.We have looked behind the notice only in those rare instances involving unreported illegal income where the respondent relied upon a "'naked' assessment without any foundation whatsoever." United States v. Janis,428 U.S. 433, 441 (1976); Jackson v. Commissioner, supra at 401. Even assuming that this case presents such a "rare instance," petitioner cannot contend that the determination of unreported income is without foundation. He admitted it to respondent. Therefore, the burden of going forward as well as the ultimate burden of persuasion on that issue remains with petitioner. The other determination that petitioner contends is arbitrary is that of the disallowed losses. Petitioner kept no records of his wins and losses. Rather, to substantiate the claimed losses he produced some 8,000 *102 gambling tickets. Respondent should not suffer adverse consequences from petitioner's failure to keep adequate records. Petitioner's gambling activity was, by his own admission, erratic. This may, by itself, provide enough of a foundation to support the deficiency, arrived at by disallowing losses where bets were made at more than three windows or more than nine tickets were bet on a single race. [7] "[T]he taxpayer should not be allowed to avoid paying taxes simply because he keeps incomplete records." Adamson v. Commissioner,745 F.2d 541, 548 (9th Cir. 1984). Also, respondent has additional proof to support *103 the deficiency attributable to the disallowed losses. By examination of the W-2Gs and losing tickets, respondent determined, among other things, that petitioner's gambling activities on June 7, 1982, had netted a deficit of approximately $ 46,000. In other words, petitioner would have had to have some source of funds to support the claimed losses. While loans from relatives explain some of this, as do unreported winnings under $ 600, there remained a large discrepancy. In addition, the loans were undocumented, and the balance at any one time was not known. We find enough evidence to support a foundation for the statutory notice of deficiency, and hold that the burden of going forward as well as the burden of proof, except on the issue of fraud, rests with petitioner. [8]
*104 The first issue deals with unreported gambling income. Section 61 states that gross income includes all income, from whatever source derived. This includes gambling winnings. McClanahan v. United States,292 F.2d 630 (5th Cir. 1961). Petitioner admitted both at the administrative level and at trial that he had approximately $ 100 a day in gambling winnings under $ 600. Consequently, we uphold respondent's determination on this issue. The next issue is whether the underpayment of tax attributable to the unreported income is due to fraud. Section 6653(b) provides that if any part of any underpayment is due to fraud, there will be an addition to tax of 50 percent of the underpayment (not only the underpayment attributable to fraud), plus 50 percent of the interest on the underpayment. Respondent must prove fraud by clear and convincing evidence. Sec. 7454; Rule 142(b). Fraud is the *105 intentional wrongdoing on the part of a taxpayer with the specific purpose of evading a tax known or believed to be owing. Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). Because fraudulent intention is difficult to prove, the omission of amounts of income has been used by courts to prove circumstantially the requisite intent. Holland v. United States,348 U.S. 121 (1954); Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Baumgardner v. Commissioner,251 F.2d 311 (9th Cir. 1957), affg. T.C. Memo. 1956-112; Lusk v. Commissioner,250 F.2d 591 (7th Cir. 1957), affg. T.C. Memo. 1955-119. In this case, all reported winnings were from horserace gambling. Petitioner failed to report gambling winnings other than horserace winnings (except the lottery), and did not report horserace winnings where the tickets cashed were less than $ 600. Petitioner knew he should have reported these winnings. Having admitted this, petitioner argues that he nonetheless lacked the fraudulent *106 intent, and we agree. Petitioner's explanation for the unreported winnings is that losing wagers on winning tickets approximately equaled the winnings not in excess of $ 600. Thus, since losses equaled winnings, there was no net income. Petitioner proved that this was the likely case from respondent's statistical data. [9]
Respondent has failed in his burden of proof on the fraud issue. Respondent asserted only that approximately $ 15,000 and $ 8,000 created understatements attributable to fraud. These omissions were satisfactorily explained by petitioner. [10] In addition, respondent has failed to prove that any other omissions were more than de minimis. Respondent made no contentions as to the disallowed *107 losses. Because there is no other evidence of fraud, we hold that petitioner is not liable for the section 6653(b) addition. The next issue for consideration is whether petitioner should be allowed gambling losses in excess of those allowed by respondent. Respondent disallowed approximately half of the losses represented by the losing tickets. His methodology was to disallow losses on a particular race when there were bets at more than three windows or more than nine tickets on a single race. Section 165(d) allows a deduction for gambling losses only to the extent of gains therefrom. This is a factual issue, upon which petitioner has the burden of proof. Burnet v. Houston,283 U.S. 223 (1931); Mack v. Commissioner,429 F.2d 182 (6th Cir. 1970), affg. T.C. Memo. 1969-26; Fogel v. Commissioner,237 F.2d 917 (6th Cir. 1956), *108 affg. per curiam T.C. Memo. 1955-186. Petitioneer did not keep records of his gambling winnings and losses. The only records we have are his W-2Gs and several thousand losing tickets. This is especially damaging to petitioner. Our comments in Schooler v. Commissioner,68 T.C. 867, 870-871 (1977), apply particularly well here: We appreciate that many taxpayers do not keep a detailed record of their wagering winnings and losses. Yet, section 1.6001-1(a), Income Tax Regs., imposes on all taxpayers the duty of maintaining "permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." * * * There is no indication that the petitioner or other taxpayers engaged in wagering transactions could not maintain * * * records, such as a daily diary setting forth all the wagering transactions. Deductions for other purposes are not allowable unless substantiated by adequate records. * * *109 * There is surely no reason to treat taxpayers such as the petitioner who claim to have sustained wagering losses more favorably than other taxpayers, by allowing a deduction for wagering losses when the evidence is vague and inadequate. Notwithstanding the infirmities in petitioner's substantiation, we have allowed losses in similar cases based on estimates where we are convinced that a loss was sustained, based on Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). See Drews v. Commissioner,25 T.C. 1354 (1956); Taormina v. Commissioner,T.C. Memo. 1976-94. Cf. Stein v. Commissioner,322 F.2d 78 (5th Cir. 1963). Notwitstanding petitioner's weak substantiation, the record supports a conclusion, and we so find, that he incurred and should be allowed losses in excess of those allowed by respondent. [11] For example, in 1982 petitioner had net reported winnings [12] of $ 92,869, and respondent allowed $ 46,251 in losses. In 1983 petitioner had net winnings of $ 55,043 and respondent allowed $ 28,730 in losses. Petitioner had no bank accounts, had relatively few non-gambling expenses because he lived with his *110 father, and had few, if any, other assets. Thus, petitioner's lifestyle does not indicate a net gain of approximately $ 46,000 in 1982 and $ 26,000 in 1983. On the other hand, we are also convinced that petitioner's tickets do not altogether accurately reflect his losses. Respondent's computations indicate that on June 7, 1982, petitioner's net gambling activity, if the tickets were accurate, would have required approximately $ 46,000 in either unreported winnings or loans. Petitioner testified to receiving only a maximum of $ 25,000 in loans, and the balance of such loans at any one time was impossible to determine. [13] Thus, on the facts presented, we think this is a proper case for the application of the Cohan rule. We allow petitioner $ 75,000 and $ 38,000 total in gambling deductions for 1982 and 1983, respectively. *111 For the most part, we found petitioner's testimony honest and credible. We believe that a majority of the tickets represent losses sustained by petitioner, especially in view of his modest lifestyle, his lack of other (non-gambling) sources of income or expense, and the fact that he spent a good portion of the years at issue at the racetrack. In addition, respondent's analysis did not indicate that any of the tickets were dirty, torn, footprinted or had other evidence of unreliability. See Taormina v. Commissioner, supra;Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We must emphasize that the gambling tickets in and of themselves have little probative value. They are not adequate records because, among other things, they do not reflect any winnings. Only when coupled with the other considerations mentioned above are they significant. Respondent argues that this case is indistinguishable from Schooler v. Commissioner, supra, and Donovan v. Commissioner,359 F.2d 64 (1st Cir. 1966), affg. per curiam T.C. Memo. 1965-247. The *112 essence of those cases is that if there are unreported winnings, the taxpayer must establish that the losses exceed the unreported winnings in order to deduct such losses. [14] We find that the tickets presented by petitioner establish that losses exceeded the approximately $ 23,000 in unreported winnings.[15] Moreover, in both Schooler[16] and Donovan, the taxpayers either reported no winnings, or reported relatively small winnings, and did not present any losing tickets. Here, petitioner reported approximately 90 percent of his winnings, and at a minimum presented tickets that evidence a large portion of the losses. The final issue concerns the addition to tax for substantial understatement *113 of income tax liability under section 6661. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Respondent has not waived this addition, which, in any event, requires that the taxpayer show that he acted with reasonable cause and in good faith. Sec. 6661(c). This was not shown. If the understatements are still substantial, redetermined in light of our prior holdings, the section 6661 addition must be recomputed. [17] Also, petitioner's claim for overpayment must be disposed of according to our previous holdings. *114 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Plus 50 percent of the interest on the underpayments. ↩
2. In general, a trifecta box involves picking three (and often more) horses, and consists of six (or more) separate bets. The bettor will win if the horses finish first, second and third, in any order. For example, a 1-2-3 box will win if the horses finish 1-2-3, 1-3-2, 2-1-3, 2-3-1, 3-1-2, or 3-2-1. Because a box is actually six different wagers it cost six times as much as a single dollar amount wager. A four horse trifecta box, picking any four horses to finish first, second and third, is 24 separate wagers. ↩
3. In general, wheeling involves choosing a particular horse or horses to finish in order and betting these in combination with every other horse in the race to finish first, second and third, and, like a trifecta box, is actually a multiple of bets. For example, in an eight-horse race a 1-2-x wheel would win if the horses finished 1-2-3, 1-2-4, 1-2-5, 1-2-6, 1-2-7, or 1-2-8. Thus, this wheel would be six different bets, and cost six times the amount of a single wager. ↩
4. The only way a line could hold multiple bets was on the gimmick wagers. For example, a bet on number three to win is one bet on one line, and no subsequent bets appear on that line. However, a 1-2-3 trifecta box is six bets on a line, and a 1-x-x trifecta wheel in an eight-horse race is 42 separate bets on a line. ↩
5. This is the basis for the understatement of winnings in respondent's notice of deficiency. Petitioner's estimates during administrative conferences of 150 and 80 days at the track for 1982 and 1983, respectively, were multiplied by $ 100 to arrive at the deficiency. The correct number of racing days appears to be 120 for 1983, based on the number of days for which petitioner has turned in losing tickets. Respondent has made no adjustment in his determination. ↩
6. Although petitioner included all winnings over the amount of $ 600 at United States horse racetracks, the only W-2Gs attached to the returns were those where tax was withheld (winnings over $ 1,000). ↩
7. At least one circuit has held that the burden of going forward does not shift in a case where deductions are disallowed, as opposed to a case where there is unreported illegal income. United States v. Zolla,724 F.2d 808 (9th Cir. 1984), cert. denied 469 U.S. 830 (1984); Karme v. Commissioner,673 F.2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163↩ (1980). (Commissioner need not make any factual showing in support of a deficiency determination based on the disallowance of deductions.) 8. Petitioner cites cases involving unreported gross income derived from illegal gambling or narcotics activities. Carson v. United States,560 F.2d 693 (5th Cir. 1977); Gerardo v. Commissioner,552 F.2d 549 (3d Cir. 1977); Jackson v. Commissioner,73 T.C. 394 (1979). We think there is a difference between unreported, illegal income and claimed losses. Karme v. Commissioner, supra.↩
9. For 1982, petitioner had approximately eight bets per ticket at $ 2.50 per bet. Thus, on any winning ticket there would likely be seven losing bets. There were 76 winning tickets over $ 600, and based on petitioner's testimony, 680 winning tickets under $ 600 (average of four wins per day times 170 racing days). Seven losing bets times $ 2.50 per bet times 756 winning tickets equals approximately $ 13,000. This is within $ 2,000 of petitioner's estimated winnings. ↩
10. See Wechsler v. Commissioner,T.C. Memo. 1961-345↩, where we held that fraudulent intent was not proved where the unreported income could have been offset by claimed deductions. 11. Were gambling losses subject to the stringent substantiation requirements of sec. 274(d), the bundle of losing tickets presented by petitioner would not be adequate evidence to allow the losses. ↩
12. Net of Federal and state taxes. ↩
13. We disregarded both unreported winnings and unreported losses, as petitioner claims and we accept that they were offsetting. See discussion, supra,↩ of the fraud issue. 14. Of course, these would only be deductible to the extent of reported winnings. Sec. 165(d)↩. 15. It is entirely possible, as discussed in connection with the fraud issue, that the unclaimed deductions are approximately equal to the unreported winnings.↩
16. In Schooler v. Commissioner,68 T.C. 867↩ (1977), the taxpayer argued that because of his modest style of living, and because he borrowed money, that losses necessarily had to exceed unreported winnings. 17. In this regard as of the time of the notice of deficiency in which respondent determined the sec. 6661(a) additions to tax against petitioner, the sec. 6661(a) addition to tax was equal to 10 percent of the underpayment attributable to a substantial understatement. Sec. 6661(a) has twice been amended since then. The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1504(a), 100 Stat. 2085, 2743, increased the sec. 6661(a) addition to tax to 20 percent of the underpayment attributable to a substantial understatement for returns the due date of which, determined without regard to extensions, is after Dec. 31, 1986. The Omnibus Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the sec. 6661(a) addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after Oct. 21, 1986. Respondent has not amended his answer to seek an increase to the sec. 6661(a) addition to tax over the amount determined in the notice of deficiency. Accordingly, we express no opinion at this time as to the effect of either of the above-referenced Acts on sec. 6661(a). We merely sustain respondent's determination of sec. 6661(a)↩ additions to tax equal to 10 percent of the underpayment attributable to any such substantial understatement.