EUGENE BALKEN AND CHERI BALKEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BRENT JENKINS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Balken v. Commissioner
Docket Nos. 7628-90, 24268-90
United States Tax Court
T.C. Memo 1994-375; 1994 Tax Ct. Memo LEXIS 384; 68 T.C.M. (CCH) 346; August 9, 1994, Filed *384 Decision will be entered under Rule 155. Eugene Balken and Brent Jenkins, pro se. For respondent: Gail Gibson. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax in these consolidated cases for the taxable years 1986 and 1987 as follows: Eugene and Cheri Balken:
Additions to Tax Sec.
Sec. Sec. Sec. Year
Deficiency
6651(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$ 30,292
$ 7,587
$ 1,650
[1]
$ 7,573
1987
21,691
--
$ 1,085
[1]
5,423
Brent Jenkins:
Additions to Tax Sec.
Sec. Sec. Sec. Year
Deficiency
6651(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$ 54,481.81
--
$ 2,724.09
[1]
$ 13,620.45
1987
50,775.44
--
2,538.77
[1]
12,693.86
After considering the agreements of the parties, the following issues remain for our consideration: (1) Whether petitioners failed to report income from gambling activities; (2) whether petitioners are entitled to gambling losses in excess of the *385 amounts allowed by respondent; and (3) whether petitioners are liable for any of the additions to tax determined by respondent. [1]
All section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT [2]
Petitioners Eugene and Cheri Balken resided in Fargo, North Dakota, at the time their petition was filed in this case. Petitioner Brent Jenkins (Mr. Jenkins) resided in Erie, North Dakota, at the time his petition was filed. Mr. Jenkins is a college graduate with *386 his major in agricultural economics. Eugene Balken (Mr. Balken) and Mr. Jenkins were engaged in the business of farming, and Cheri Balken was employed as a nurse during the years in question. Mr. Balken is a college graduate and received a degree in education, with majors in mathematics and social studies. During the time Mr. Balken was not able to engage in farming activity (i.e., during the winter), he gambled. Mr. Jenkins gambled during the entire year, time permitting. More particularly, they engaged in a form of gambling commonly described as "playing pulltabs". Mr. Jenkins also played bingo. Pulltabs are tickets designed so that the information on the ticket is not revealed until a tab is peeled away from the ticket. The pulltab game is also known as and/or related to the terms "break opens", "pickle jar", and "hard cards". The tickets with concealed information are stored in a container (usually a glass jar) and players pay a fixed fee to withdraw and peel the tab. Within each jar is a fixed number of winning tickets. The number and amount of the winning tickets are disclosed to the players. In North Dakota the games are operated by charities pursuant to State regulation. *387 The jars are designed so that the purchase of all tickets would result in about 20 percent going to the charity. In theory, $ 4 out of $ 5 wagered would be returned to the players. Accordingly, if a player experienced a few winners and was ahead early in the play of a jar, it would be advantageous to quit and play another jar. Mr. Jenkins and Mr. Balken generally played the games in a similar fashion. Mr. Balken, due to his educational background, was especially well suited to determine the odds and chances for success in playing a jar. For example, a jar could contain about 4,600 tickets at $ 1 per ticket, and the cost of the entire jar was $ 4,600. If a player purchased every ticket, however, the net loss would be about 20 percent of the total cost of tickets. It would be unusual for the jar operator to sell every ticket because players would not purchase the remaining tickets if it was known that the big winners had already been collected from that jar. Mr. Jenkins and Mr. Balken generally joined with others to play pulltabs. Two or three players became joint venturers in playing the same jar because of individual capital limitations. Once they began playing a jar, joint *388 venturers usually wished to continue without the involvement of other players in order to protect their capital investment or stake in a particular jar. Additionally, two or three people would consume about 3 or 4 hours to open a jar (open tickets and keep track of the number of winners received and remaining in the jar). If players invested substantially in a jar without a winner ("get buried" in a jar), they became covetous of the jar and continued to jointly invest in the hopes of picking the winners. Mr. Balken and Mr. Jenkins preferred to play new jars because of the potential for being able to hit all the winners on the front end of the play. If new players wished to purchase tickets from a jar and the active players believed that their position in a jar (investment and lack of return) warranted, some game operators allowed a player or group of players to "freeze the jar". Generally, to freeze a jar a player was required to purchase sufficient tickets to account for the largest winning ticket in a jar -- i.e., $ 500. The rules for operating the games, including tactics like freezing the jar, are all regulated by the State of North Dakota. Playing in groups enabled players *389 to be in a better capital position to freeze the jar. Experienced players would play jars opened by others. To do this, a player would inquire of the jar operator as to the amount of the "bank" or the dollars received and paid out for the particular jar. After November 1986, the State prohibited the operators from advising players of the bank numbers. Mr. Jenkins and Mr. Balken played pulltabs for prolonged periods of time, and food and beverages were available at the gambling locations. With the exception of some of Mr. Jenkins's bingo activities, no receipts were issued for the purchase of pulltab tickets during the periods under consideration. The operators kept records of the names of $ 100 and larger winners and no records were kept of less-than-$ 100 winners. Mr. Balken and Mr. Jenkins would not segregate or save smaller winnings, such as $ 2, $ 5, $ 10, and $ 20 winning tickets. Usually, the smaller amounts were plowed back into the jar by the purchase of more tickets to seek larger winning amounts. Petitioners were audited by respondent's revenue agent Kurt Ochsner (Mr. Ochsner), a certified public accountant. Petitioners were audited as part of a series of audits *390 concerning pulltab and related gambling. As a matter of policy, where a taxpayer was unable to prove the amount expended in gambling activities, respondent's agents allowed $ 2 per reported winner because $ 2 was the maximum amount a player could have paid for a pulltab ticket. The Balkens did not report any amount from Mr. Balken's gambling activity, based upon their position that they had net losses for 1986 and 1987. Respondent determined that the Balkens failed to report income equal to the amount of reported winners (those over $ 100) or additional income of $ 115,479 for 1986 and $ 73,260 for 1987. Mr. Jenkins had reported $ 2,500 for 1987, and respondent determined an additional $ 135,991 for that year. Mr. Jenkins had not reported any gambling winnings for 1986, and respondent determined that he had $ 186,317 of unreported gambling income for that year. Mr. Jenkins was allowed gambling expenses of $ 1,635 for 1986 and $ 17,258 for 1987. The Balkens were not allowed any gambling expenses for 1986 or 1987 because the amount respondent would allow ($ 2 per $ 100-or-more winner) was not sufficient to permit an itemized rather than a standard deduction for either year. *391 If a check was offered by petitioners in support of the purchase of tickets in addition to the winning tickets, Mr. Ochsner would not allow it even though the payee was an operator of pulltab games, unless other corroborating evidence was produced. Even where some corroboration was offered it was not fully allowed unless it reflected all possible information about the game, i.e., whether there were winners for amounts less than $ 100, whether a cashed check was actually reinvested in the game, etc. Where all possible information was not available, Mr. Ochsner would allow only the corroborated amounts up to the amount of the reported winning from the particular jar or game under consideration. Mr. Ochsner used an indirect method of supporting the determination of the amount of income petitioners received from their gambling activities. He used the "cash-T" method, which is related to a sources and applications of funds approach. On one side of the "T" Mr. Ochsner listed the sources of money and on the other he listed the uses of the money. Based upon the information reported on the Balken's returns and information provided by Mr. Balken, Mr. Ochsner developed a "cash T" for the *392 Balkens. That methodology resulted in applications of funds exceeding reported sources by $ 6,720 in 1986 and $ 4,082 in 1987. Using the same methodology for Mr. Jenkins, his applications of funds exceeded sources by $ 4,469 in 1986 and $ 18,617 in 1987. In performing these analyses, Mr. Ochsner made assumptions about the purchase of necessities, such as food. If Mr. Ochsner believed that the amounts shown on check stubs or testified to were too small, he would add an amount to the application side of the "cash T". Mr. Ochsner believed that these amounts represent the minimum net winnings of petitioners from gambling. OPINION Initially, petitioners argue that respondent's determination should not be afforded the presumption of correctness and that respondent should bear the burden of going forward with the evidence. Petitioners refer us to Pizzarello v. United States, 408 F.2d 579 (2d Cir. 1969), regarding their contention. Petitioners' argument that the notices of deficiency are arbitrary and therefore invalid is not warranted by the evidence in this case. Respondent was possessed of substantial evidence reflecting that petitioners had each *393 been paid amounts for winning pulltabs approaching or exceeding $ 100,000 for each taxable year. Prior to issuance of the notices, respondent conducted an audit examination, and petitioners did not provide records that satisfied respondent's agent of the amount of corresponding losses they had incurred in connection with their gambling activity. Accordingly, we find that the notices of deficiency in these cases are valid and carry the presumption of correctness. Valid notices of deficiency place petitioners in the position of bearing the burden of going forward with evidence and proving that they are entitled to deductions for losses from their gambling activity. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners concede that they received additional income from gambling. They each contend, however, that their losses in each year exceeded the amount of the conceded income and that they had no net income from gambling. Petitioners bear the burden of proving that their claimed gambling losses were sustained. This is a purely factual issue to be decided upon the facts and circumstances of each case. Fogel v. Commissioner, 237 F.2d 917 (6th Cir. 1956), *394 affg. per curiam T.C. Memo. 1955-186; Green v. Commissioner, 66 T.C. 538, 544 (1976). Petitioners, although required under section 6001 to keep contemporaneous records to substantiate claimed deductions, failed to do so. Sec. 1.6001-1(a), Income Tax Regs. If petitioners can convince us that a loss was sustained, however, amounts may be allowable under Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Before the principle of the Cohan case is applicable, there must be sufficient evidence establishing that some loss was sustained. Stein v. Commissioner, 322 F.2d 78, 83 (5th Cir. 1963), affg. T.C. Memo. 1962-19; Schooler v. Commissioner, 68 T.C. 867, 871 (1977). This Court has decided that losses are allowable based, at least in part, upon estimates. Drews v. Commissioner, 25 T.C. 1354 (1956); Doffin v. Commissioner, T.C. Memo. 1991-114; Forman v. Commissioner, T.C. Memo. 1988-64; Kalisch v. Commissioner, T.C. Memo. 1986-541, *395 affd. without published opinion 838 F.2d 461 (3d Cir. 1987). The Doffin case involved a North Dakota pulltab player in a similar posture to that of petitioners. Mr. Doffin had substantial pulltab winners which were not in dispute, and respondent allowed a deduction for losses equal to $ 2 for each winning ticket of $ 100 or more. As in Doffin, we are convinced here that Mr. Jenkins and Mr. Balken had purchased more tickets than those which resulted in winners of $ 100 or more (those which were recorded). Accordingly, we are convinced that the principle of the Cohan case applies here. The question we must decide is the amount of the deductions that petitioners have established based upon the record in these consolidated cases. One major difference between Doffin and these cases is that the parties here offered expert witnesses to support their respective arguments. Petitioners' expert, Gladys Bohmer (Ms. Bohmer), had 14 years of experience as an operator of pulltab games. She was also instrumental in devising an accounting system that would permit gaming operators to evaluate the remaining quality or probabilities of an active jar. *396 Ms. Bohmer reviewed the operators' records for some of the games played by Mr. Balken and Mr. Jenkins. Some of the material she reviewed was illegible or incomplete, and assumptions were necessary. She also made the following assumptions: (1) That petitioners played new games jointly with other players; (2) that they were able to and did freeze games; (3) that, on occasion, they would purchase some part of the remaining tickets in a jar to cause the operator to open a new jar; (4) that petitioners and their joint venturers were the only players to play the jars for which records were reviewed; (5) the amount of profit or loss on a jar can be determined by looking at the net of the money received and paid out, according to the operators' records; (6) that if a player(s) signed for 50 percent of the major winners that the same player(s) received 50 percent of the minor winners (for which no records were kept); (7) that minor winners were always reinvested in the game to purchase additional pulltabs and that the reinvestment did not net profits; (8) $ 51 for 1986 and $ 47 for 1987 were added to net wins and reduced from net losses to reflect the "average daily play"; and (9) no amounts *397 were considered for food or beverages which may have been purchased on the premises during the time of play. Based upon the above methodology, Ms. Bohmer concluded that Mr. Jenkins and Mr. Balken received and expended the following amounts resulting in net losses for 1986 and 1987: Received from
Player--Year
Expended to Play
Playing
Net Losses
Balken--1986
$ 111,786
$ 106,848
$ 7,191
Balken--1987
60,874
59,290
2,728
Jenkins--1986
172,278
164,693
11,058
Jenkins--1987
111,316
106,372
4,849
Respondent offered Robert Snyder (Mr. Snyder) as an expert witness. Mr. Snyder conducted gambling investigations for the Los Angeles County Sheriff's Department for about 22 years. He has been a consultant to businesses in the gaming industry and government, including the Canadian Government, and he trains gambling investigators. Mr. Snyder reviewed the operators' records for some of the games played by Mr. Balken and Mr. Jenkins. Mr. Snyder reviewed about one-half of the records concerning games on which Mr. Balken or Mr. Jenkins had winners of $ 100 or more. Based upon theoretical assumptions, he concluded that the ratio of wins on all games would be the same *398 as the sample, and further, that the ratio of wins on unrecorded amounts (less than $ 100) would be the same as for those that were recorded ($ 100 or more). Using the assumptions and conclusion, Mr. Snyder's expert reports reflect a larger gross winning for petitioners than determined by respondent. Mr. Snyder concluded that a pulltab player without any conscious strategy would receive about 80 cents for every $ 1 wagered. According to Mr. Snyder, an avid player would be aware of the large winners already removed from the jar and the approximate number of tickets remaining to be purchased. So, for example, if the jar were half full of tickets but more than half of the large winning tickets remained, the jar would offer a better than 80 percent chance to win on the remaining tickets. Mr. Snyder also observed that less than 5 percent of the games he reviewed sold out to completion, which he concluded indicates that Mr. Balken and Mr. Jenkins would be either minimizing losses or protecting gains by concluding a game where the odds on the remaining tickets were not favorable. Mr. Snyder concluded that the only way to overcome the built-in profit for the operator of the game and *399 experience profitable results is by playing jars which have improved odds because of the removal of losing tickets. On games which petitioners played from the beginning to near the end, it is likely that the operators' percentage caused petitioners to experience a loss on that game. Based upon his methodology, Mr. Snyder concluded that Mr. Balken and Mr. Jenkins had winnings as determined by respondent and, in addition, winnings from unrecorded (less than $ 100) winning tickets as follows: Taxpayer/Year
Recorded Winnings
Unrecorded Winnings
Mr. Balken
1986
$ 115,479
$ 42,554.00
Mr. Balken
1987
73,260
22,769.20
Mr. Jenkins
1986
185,892
64,839.00
Mr. Jenkins
1987
135,991
41,817.00
Mr. Snyder did not render a specific opinion regarding the amount of losses incurred by petitioners. Although the numbers do not reconcile, the theories of the experts' opinions do not inherently contradict each other. We are left, however, with the same extreme positions that the parties advocated. Petitioners and their expert contend that, overall, petitioners had net losses from their gambling activity. Respondent and her expert contend that petitioners had more gains than *400 were recorded (the ones less than $ 100) and that petitioners have not proven with specificity the amount of their losses. We cannot agree with either of the parties' positions. There can be no doubt that petitioners purchased more than the recorded $ 100 and larger winning tickets. It is also obvious that petitioners, who played pulltabs for long hours day after day, experienced winners less than $ 100 and purchased numerous tickets for which they received no return. The positions of the parties and the opinions of their experts contain assumptions that are not supported by the record. Petitioners' expert does not properly adjust for the presence of intervening players and the quality of petitioners' gambling methodology. Her assumption that petitioners played new jars and played them down does not ring true based on the evidence which reflects that some of the games were played over more than a 1-week period. Based on the evidence, it appears that petitioners did not exclusively exploit the same jars to their own detriment. The operators' records also reflect that petitioners did not play only new jars. Based upon their education, demeanor, and gambling methodology, petitioners *401 played pulltab games in which the operator had reduced profit potential and/or in which other intervening players had improved the odds for petitioners. Petitioners have shown themselves to be sophisticated pulltab aficionados who were capable of successful gambling activity. No matter how effective petitioners' approach, however, we are cognizant of the operators' built-in profit advantage, which, coupled with petitioners' propensity to play extensively, in time would reduce their chances for success. To some extent each of the experts' and parties' positions is arbitrary because they argue what could or would have happened if certain conditions existed and certain assumptions are correct. We also suspect that petitioners also may have used some of their winnings to purchase things other than losing tickets, including food and beverages consumed while gambling. With these factors in mind, and considering that petitioners' dilemma here is caused by their own failure to keep or offer adequate records of their gambling activity, we find that petitioners had net gambling winnings for 1986 and 1987, as follows: Petitioner
1986 1987 Balken
$ 5,774
$ 3,663
Jenkins
9,295
6,800
*402 Finally, we note that respondent's agent's source and application of funds test ("cash-T" method) resulted in amounts that, to some extent, comport with our holding. We do not place much reliance upon the source and application approach used here because it was intended merely as a cross-check and the assumptions made are generally not supported by the evidence. There also remains in dispute respondent's determination of additions to tax under sections 6653(a)(1)(A) and (B) and 6661(a) for both taxable years of all petitioners. Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) imposes a further addition to tax in an amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. For purposes of this section, negligence is the "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) *403 (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299). Failure to maintain adequate records of gambling activity has been held sufficient to impose the addition to tax for negligence. Marcello v. Commissioner, supra at 511; Mack v. Commissioner, 429 F.2d 182 (6th Cir. 1970), affg. T.C. Memo. 1969-26. Petitioners in both cases failed to keep and/or present records of their gambling activity. In addition, with the exception of some bingo winnings reported by Mr. Jenkins, petitioners failed to report their gambling winnings or losses. Accordingly, petitioners in both cases are liable for additions to tax under section 6653(a)(1)(A) and (B). Respondent also determined an addition to tax under section 6661 for both years for all petitioners. Petitioners argue simply that there is no addition due because there is no deficiency. Our holding that petitioners have failed to report net gambling winnings in each year *404 will result in some amount of deficiency and understatement in income tax in each year for all petitioners. Accordingly, if recomputation of petitioners' tax liability reflects a substantial understatement, petitioners are liable for this addition to tax. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. 50 percent of the interest on the entire underpayment.↩
1. 50 percent of the interest on the entire underpayment.↩
1. Petitioners Eugene and Cheri Balken conceded that they are liable for the addition to tax under sec. 6651(a)(1) for their 1986 taxable year.↩
2. The parties entered into stipulations of facts and exhibits which are incorporated by this reference.↩